# UNITED STATES DISTRICT COURT

for the
District of Colorado

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>One (1) Samsung Galaxy S10 cell phone,<br>identified under DEA Case No. MK-16-0044,<br>Exhibit N-343, SSEE S000897975 | )<br>)<br>)<br>)<br>)<br>)<br>)    Case No.    20-sw-1279-STV |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**SEE "ATTACHMENT A"**, which is attached to and incorporated in this Application and Affidavit

located in the _____ State and _____ District of _____ Colorado _____ , there is now concealed *(identify the person or describe the property to be seized)*:

**SEE "ATTACHMENT B"**, which is attached to and incorporated in this Application and Affidavit

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☒ evidence of a crime;
- ☒ contraband, fruits of crime, or other items illegally possessed;
- ☒ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Distribution of controlled substances and possession with intent to distribute controlled substances, to wit: cocaine |
| 21 U.S.C. § 846 | Attempt and conspiracy |

The application is based on these facts:
- ☒ Continued on the attached affidavit, which is incorporated by reference.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*s/Ryan P. Donahue*

*Applicant's signature*

Ryan P. Donahue, Special Agent, DEA

*Printed name and title*

Sworn to before me and: ☐ signed in my presence.
☒ submitted, attested to, and acknowledged by reliable electronic means.

Date: _____ October 26, 2020 _____

City and state: _____ Denver, CO _____

*Judge's signature*

Scott T. Varholak, U.S. Magistrate Judge

*Printed name and title*

**ATTACHMENT A**

**<u>DESCRIPTION OF LOCATION TO BE SEARCHED</u>**

One (1) Samsung Galaxy S10 cell phone (the "Device").  The Device is currently locked and no additional identification information can be retrieved from the Device.  The Device is currently in the possession of the DEA, Denver Field Division Office, under case number MK-16-0044, Exhibit N-343, SSEE S000897975, and has been in DEA's custody since September 26, 2019.

## ATTACHMENT B

## DESCRIPTION OF ITEMS TO BE SEIZED AND SEARCHED

For the Device listed and described in **Attachment A**, the following items, that constitute evidence of the commission of, contraband, the fruits of crime, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (distribution of controlled substances and possession with intent to distribute controlled substances, to wit, cocaine) and 21 U.S.C. § 846 (attempt and conspiracy) (the "Subject Offenses"):

1.      Any and all information, notes, software, documents, records, or correspondence, in any format and medium, pertaining to violations of Subject Offenses.

2.      All records on the Device described in **Attachment A** that relate to violations of the Subject Offenses and involve LOPEZ, RAMOS-TELLEZ, and other co-conspirators, on or about or before July 17, 2019, including:

   a. Lists of customers and related identifying information;

   b. types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

   c. any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

   d. any information recording LOPEZ'S, RAMOS-TELLEZ'S, and/or other co-conspirators' schedule or travel on or about or before July 17, 2019 to September 26, 2019;

   e. all bank records, checks, credit card bills, account information, and other financial records.

3.      Any and all address books, names, and lists of names and addresses of individuals who may have been contacted by use of the Device or by other means for the purpose of committing violations of Subject Offenses.

4.      Any and all information, records, documents, invoices and materials, in any format or medium, that concern any accounts with an Internet Service Provider pertaining to violations of Subject Offenses.

5.      Any and all information, records, documents, invoices and materials, in any format or medium, that concern e-mail accounts, online storage, or other remote computer storage pertaining to violations of Subject Offenses.

6.      Records of Internet activity, including Internet Protocol addresses, firewall logs, transactions with Internet hosting providers, co-located computer systems, cloud computing services, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses

pertaining to violations of Subject Offenses or that show who used, owned, possessed, or controlled the Device.

7.      Any and all information, documents, records, photos, videos, audio recordings, or correspondence, in any format or medium, pertaining to use or ownership of the Device, or that aid in the identification of persons involved in violations of Subject Offenses.

8.      Credit card information, bills, and payment records pertaining to violations of Subject Offenses.

9.      Information about usernames or any online accounts or email addresses.

10.     Descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to violations of Subject Offenses.

11.     Evidence of who used, owned, or controlled the Device to commit or facilitate the commission of the Subject Offenses, or at the time the things described in this warrant were created, edited, or deleted, including photographs, videos, audio recordings, logs, call logs, phonebooks, address books, contacts, IP addresses, registry entries, configuration files, saved usernames and passwords, documents, calendars, browsing history, search terms, metadata, user profiles, e-mail, e-mail contacts, messages (text or voice), instant messaging logs, file structure and correspondence.

12.     Evidence of software that may allow others to control the Device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security provisions or software designed to detect malicious software or unauthorized use of the Device, and evidence of the lack of such malicious software.

13.     Evidence of the attachment to the Device of other storage devices or similar containers for electronic evidence.

14.     Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Device.

15.     Evidence of how and when the Device was used or accessed to determine the chronological context of access, use, and events relating to crime under investigation and to the user;

16.     The telephone number, ESN number, serial number, and/or SIM card numbers of or contained in the Device.

17.     Passwords, encryption keys, and other access devices that may be necessary to access the Device.

18.     Contextual information necessary to understand the evidence described in this attachment.

<u>DEFINITIONS:</u>

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, RYAN P. DONAHUE, a Special Agent with the Drug Enforcement Administration, being duly sworn according to law, hereby state that the facts set forth in this affidavit are true and correct to the best of my knowledge, information, and belief:

## INTRODUCTION

1.     This affidavit is submitted in support of an application under Fed. R. Crim. P. 41 for a search warrant authorizing the examination of property – an electronic device, identified in **Attachment A** as the "Device" – which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in **Attachment B.**  As set forth herein, there is probable cause to believe that a forensic examination of the Device for the purpose of identifying electronically stored data will reveal evidence, fruits, and/or instrumentalities of violations of federal drug trafficking laws, including, but not limited to, 21 U.S.C. § 841(a)(1) (distribution of controlled substances and possession with intent to distribute controlled substances, to wit, cocaine) and 21 U.S.C. § 846 (attempt and conspiracy) committed by JOHNNY JOE LOPEZ, EDGAR MARCELLO RAMOS-TELLEZ, and other co-conspirators on or about or before July 17, 2020 (the "Subject Offenses").

## AGENT BACKGROUND

2.     Your Affiant is a Special Agent with the Drug Enforcement Administration ("DEA"). As a Special Agent with DEA I am authorized, pursuant to 21 U.S.C. § 878, to conduct investigations, to execute search warrants, and to make arrests for any offense against the United States.  I am a "Federal Law Enforcement Officer" within the meaning of FED.R.CRIM.P. 41(a)(2)(C).

3.     I have been a special agent with the DEA since July 2016.  Before that, I worked from November 2012 to March 2016 as a Senior Officer Specialist with the Federal Bureau of Prisons. During my career, I have participated in numerous drug trafficking investigations during the course of which I have (a) conducted electronic and physical surveillance; (b) debriefed and managed witnesses, cooperators and confidential sources of information who have been involved in drug trafficking and money laundering; (c) monitored wiretapped conversations of individuals committing drug trafficking and money laundering schemes and reviewed line sheets prepared by wiretap monitors; (d) worked in an undercover capacity to gather information about drug trafficking and money laundering; (e) executed search warrants at locations where records and evidence of drug trafficking and money laundering have been found; (f) and reviewed and analyzed organization records, including telephone records, bank records, records kept and maintained by drug traffickers, and property records. My experience is not limited to drug investigations. I also have extensive experience participating in complex investigations into violent street gangs.

4.     I have had experience, training, and communication with other law enforcement personnel who specialize in the area of illegal drug trafficking and documentation and the detection of proceeds from drug trafficking. Your affiant also has experience in debriefing defendants and informants as witnesses who have personal knowledge of drug trafficking organizations. Such individuals often have personal knowledge regarding the methods, transportation, and distribution of the drugs and money in large scale controlled substance distribution operations.

5.      I know, based on training and experience, as well as from information relayed to me during the course of my official duties:

a.   That a significant percentage of heroin, methamphetamine, and cocaine imported into the United States, currently enters the United States domestic market at various points along the Southwest border of the United States, and is then transported to various cities throughout the United States for retail distribution.  Furthermore, I know that the importation, transportation, and distribution of heroin, methamphetamine, and cocaine are controlled by a number of well-organized and sophisticated drug trafficking organizations.  I also know that drug trafficking organizations use couriers to transport drugs by vehicle from Mexico to various distribution centers in the United States; they use couriers to transport cash proceeds of drug sales from points of distribution in the United States back to Mexico, where the proceeds are laundered; and they use "stash houses," premises in which they warehouse large quantities of narcotics prior to their distribution.

b.   That drug traffickers use various locations to serve different functions so that customers, thieves, and law enforcement personnel do not learn about any one location where large quantities of drugs, money, and/or other drug related assets are stored. Therefore, one or more locations are often used to store lesser amounts of drugs, money, and/or drug related assets, and additional locations are used to meet customers.

c.   That persons involved in large scale drug trafficking conceal, in various locations, caches of drugs, drug paraphernalia, amounts of jewelry, automobile titles, deeds to property, and other items of value and/or proceeds of drug transactions and evidence of financial transactions relating to obtaining, transferring, secreting or spending large sums of money acquired from engaging in narcotics trafficking activities.

d.   The members of these organizations routinely utilize communication facilities including cellular telephones, satellite telephones, encryption capable UHF transceivers/two-way radios, facsimile machines, electronic mail, and text messaging to communicate with other organization members in furtherance of their illegal goals. During the course of these electronic communications, organization members commonly use coded language and references and/or encryption in an effort to elude law enforcement detection.  Based on training and experience, I know that narcotics traffickers commonly use prepaid, or "throw away" cellular telephones to avoid detection and elude law enforcement, and said traffickers also change these devices frequently to avoid detection by law enforcement officials.

e.   That drug dealers use telephones, portable cellular telephones, pagers, and other communication devices and maintain telephone and address books, telephone bills and other books and papers which reflect names, addresses, and/or telephone numbers of their associates in the narcotics trafficking organization and customers of narcotics.

2

f.  That drug trafficking organizations store information pertaining to drug trafficking activities on electronic devices, including cell phones, pagers, computers, and external hard drives.  I further know, based on my training and experience, as well as from information relayed to me during the course of my official duties, that drug trafficking organizations often retain, for long periods of time, such documents and devices, in order to maintain a record of accounts, income, expenditures, assets, and drug-related debts.

g.  I know, based on training and experience, as well as from information relayed to me during the course of my official duties, that narcotics traffickers routinely "rotate" electronic devices, including cell phones, in order to avoid detection by law enforcement.  For example, a narcotics trafficker may possess multiple cell phones and alternate the use of the cell phones on a weekly or monthly basis, before rotating to another cell phone.  Based on training and experience, I know that narcotics traffickers often retain possession of previously-used cell phones, even though such phones are no longer utilized in furtherance of narcotics trafficking.   Based on training and experience, I know that, while such phones may no longer be used for narcotics trafficking activities, the devices often contain electronic data, including call records, contact information, text messages, email, photos, video, and more, which can be evidence of past criminal activity.

h.  That drug traffickers have maintained at their locations, including the residences where they live, in their vehicles, and in off-site "stash" locations: money, ledgers, narcotic supplier lists, correspondence, notations, logs, receipts, journals, books, records, and other documents noting the price, quantity, and/or times when narcotics were obtained, transferred, sold, distributed, and/or concealed and that drug traffickers sometimes store drugs, their proceeds, and documents relating to drug activities at storage facilities in an effort to thwart law enforcement efforts to find them.

i.  That when drug traffickers amass large quantities of cash from the sale of drugs, the drug traffickers often attempt to legitimize these profits through the use of banks and financial institutions and their attendant services that include accounts, securities, traveler's checks, cashier's checks, money orders, wire transfers, stock certificates, bonds, certificates of deposit, and safety deposit boxes.

j.  That drug traffickers often place assets in names of relatives and close friends in order to avoid detection of those assets by law enforcement agencies; and that, even though these assets are in other persons' names, the drug dealers retain records, documents, and deeds reflecting the purchase and/or control of those assets while continuing to use those assets and exercise dominion and control over them.

k.   That it is common practice for large scale narcotics traffickers to travel to their purchase and distribution areas to facilitate their trafficking; that after purchasing drugs, narcotics traffickers will transport or cause to be transported narcotics to areas in which they will distribute the drugs; and that methods of transportation include commercial airlines, private airplanes, trains, buses, and rental and private automobiles.

l.   That drug traffickers take or cause to be taken photographs of themselves, their associates, their property, and their product; and that these traffickers often maintain these photographs at their premises, within vehicles, or as stored electronic images.

m.   That drug trafficking organizations maintain a variety of documents related to drug trafficking, including ledgers, hotel receipts, wire transfer paperwork, apartment rental agreements, cell phone bills, passports, photographs, credit card bills, vehicle registration documents, vehicle rental receipts, utility bills, and other documents that provide evidence of the illegal conduct of such organizations.

n.   That drug dealers commonly have in their possession, that is on their persons, at their residence and/or at their stash houses and in their automobiles, firearms, including: handguns, pistols, revolvers, rifles, shotguns, machine guns, and other weapons that are used to protect and secure the drug trafficker's property, including narcotics, narcotic paraphernalia, currency, jewelry, and records. Courts have recognized that firearms and ammunition are a tool of the drug trafficking trade; that drug traffickers utilize firearms to protect themselves from rip-offs or from their drug related items being stolen and/or seized by law enforcement.

o.   There are many reasons why drug traffickers maintain evidence for long periods of time. The evidence may be innocuous at first glance (e.g., financial, credit card and banking documents, travel documents, receipts, documents reflecting purchases of assets, personal calendars, telephone and address directories, check books, videotapes and photographs, utility records, ownership records, letters and notes, tax returns and financial records, escrow files, telephone and pager bills, keys to safe deposit boxes, packaging materials, computer hardware and software), but have significance and relevance when considered in light of other evidence. The drug trafficker may no longer realize he/she still possesses the evidence or may believe law enforcement could not obtain a search warrant to seize the evidence. The drug trafficker may also be under the mistaken belief that he/she has deleted, hidden, or further destroyed any computer related evidence. However, that evidence may still be retrievable by a trained forensic computer expert.

p.   Drug traffickers are increasingly using computer hardware and software to communicate with co-conspirators and to facilitate the financial transactions associated with both the narcotics deals themselves and with the laundering of the related proceeds. Computer hardware and software may contain spreadsheets of suppliers and

4

buyers, financial records, bank account records, criminal contacts and other information relevant to the investigation of the criminal enterprise.

q. It is common for drug traffickers to conceal contraband, proceeds of drug sales and transactions in secure locations within their residence, including "stash houses," in vehicles, or locations other than their primary residence for ready access and to conceal those items from law enforcement authorities.

r. Drug traffickers keep paraphernalia for manufacturing, packaging, weighing, and distributing controlled substances; that these paraphernalia include, but are not limited to, scales, plastic bags, aluminum foil, paper bindles, zip-lock bags, and other containers used to package and store controlled substances.

6.     The information contained within this affidavit is based on my training and experience, my personal knowledge, observations, and experience, including information of which I am personally aware by virtue of my participation in this investigation, my review of investigative reports, intelligence reports, interviews, and debriefings with participating officers, agents, and cooperating witnesses, and information imparted to me by other law enforcement officers involved in this investigation. I have spoken with other DEA Special Agents and Task Force Officers about this and other similar cases, and I have spoken with narcotics experts regarding methods of operation utilized by subjects who distribute, manufacture, traffic, and/or sell controlled substances. Furthermore, I receive training on a daily basis working on drug investigations for DEA in the Denver, Colorado Division Office. I have also spoken with other DEA Special Agents, Task Force Officers, and Intelligence Analysts regarding the technological devices, tools, and methods used by subjects that traffic and distribute controlled substances.

7.     This affidavit is submitted for the limited purpose of securing a search warrant.  As such, I have not included each and every fact known to me or other law enforcement officers concerning this investigation.  I have set forth facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities related to the Subject Offenses, described in **Attachment B**, are located in the place described in **Attachment A**.

### IDENTIFICATION OF THE DEVICE TO BE EXAMINED

8.     The property to be searched is one (1) Samsung Galaxy S10 cell phone (hereafter and in **Attachment A** and **Attachment B** referred to as the "Device").  The Device is currently locked and no additional identification information can be retrieved from the Device.  The Device is currently in the possession of the DEA, Denver Field Division Office, under case number MK-16-0044, Exhibit N-343, SSEE S000897975, and has been in DEA's custody since September 26, 2019.

9.     Your Affiant believes there is probable cause to believe that the Device is or contains evidence, fruits, and instrumentalities of violations of the Subject Offenses. The applied for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in **Attachment B.**

**TECHNICAL TERMS**

10.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.  <u>Wireless telephone</u>:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.   In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.  <u>Removable Storage Media</u>: A hard disk drive ("HDD"), also known as a hard drive or hard disk, is a data storage device that consists of an external circuit board, external data, power connections, and internal glass, ceramic, or magnetically charged rotating metal platters that permanently store data even when powered off. A solid-state drive ("SSD"), also known as a solid-state disk, is a data storage device that uses integrated circuit assemblies as memory to permanently store data instead of using rotating platters. Flash drives, flash cards, and thumb drives are digital storage devices that can connect to computers or other devices using the appropriate connection. CDs/DVDs are digital storage devices capable of storing large amounts of digital data—a user can store information onto a CD/DVD by "burning" digital data to the device using a computer CD/DVD drive. These devices are capable of storing any electronic information including images, videos, word processing documents, programs and software, and web pages. "Computers" or "digital storage media" or "digital storage devices" or "removable storage media" may be used interchangeably, and can include any physical object upon which computer data can be recorded as well as all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices capable of performing logical, arithmetic, or storage functions, including desktop and laptop computers, mobile phones, tablets, server computers, game consoles, network hardware, hard disk drives, RAM, floppy disks, flash memory, CDs, DVDs, and other magnetic or optical storage media.

c.  <u>Digital camera</u>:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved

6

by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

d. <u>Portable media player</u>: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

e. <u>PDA:</u> A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. <u>Tablet:</u> A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g. <u>GPS:</u> A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a

7

GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

h.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

i.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

11.    Based on my training, experience, and research, I know that the Device may have capabilities that allow it to serve as a wireless telephone, digital camera, PDA, tablet, portable media player, and may be a device capable of recording GPS information, connecting to the internet, and connecting to removable storage media.

**ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

12.    Based on my knowledge, training, and experience, your Affiant knows that computers and digital storage devices can store information for long periods of time. Similarly, things that have been searched for and viewed via the Internet are typically stored for some period of time on a device. This information can sometimes be recovered with forensic tools.

13.    Based on my knowledge, training, and experience, examining data stored on computers and digital storage devices can uncover, among other things, evidence that reveals or suggests who possessed or used the computer or digital storage devices.

14.    There is probable cause to believe that things that were once stored on the Device(s) may still be stored there, for at least the following reasons:

a.  Based on my knowledge, training, and experience, I know that digital files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a digital storage device or computer, the

8

data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer storage media including digital storage devices and computers' internal hard drives can contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." Forensic review may also disclose when and by whom the Internet was used to conduct searches, view material, and communicate with others via the Internet.

15.  *Forensic evidence.*   As further described in **Attachment B,** this application seeks permission to locate not only electronically stored information on the Device that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of the use, who used the Device, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage media but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of other devices to it, and the dates and times the device was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.  This information can be recovered months or even years after they have been downloaded onto the storage medium, deleted, or viewed.

b.  Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.  A person with appropriate familiarity with how devices such as a smartphone works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how the devices were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on a smartphone or other digital device that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a device is evidence may depend on other information stored on the device and the application of knowledge about how a device behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

f.  Your Affiant knows that when an individual uses an electronic device to aid in the commission of a crime, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The electronic device is also likely to be a storage medium for evidence of crime.  Based on training and experience, your Affiant anticipates that an electronic device, such as the Device, used to commit a crime of the type described herein may contain: Phone Call logs & Text Messages with other members of the conspiracy, Photographs of evidence, Map Searches and location history, financial transactions detailing expenses undertaken in furtherance of the conspiracy, and other evidence related to acts undertaken in furtherance of the conspiracy, as well as evidence demonstrating the identities and roles of the co-conspirators.

g.  Your Affiant also knows that those who engage in criminal activity will attempt to conceal evidence of the activity by hiding files, by renaming the format, (such as saving a .pdf image file as a .doc document file) or by giving them deceptive names such that it is necessary to view the contents of each file to determine what it contains.

h.  A single compact disk can store dozens of images and hundreds of pages of text. The size of the electronic storage media (commonly referred to as a hard drive) used in home computers has grown tremendously within the last several years. Thumb drives with a capacity of 32 gigabytes are not uncommon. Flash cards with a capacity of 32 gigabytes are not uncommon. Hard drives with the capacity of 500 gigabytes up to 3 terabytes are

10

not uncommon. These drives can store thousands of images and videos at very high resolution. Magnetic storage located in host computers adds another dimension to the equation. It is possible to use a video camera to capture an image, process that image in a computer with video capture capabilities, and save that image to storage in another country. Once this is done, there is no readily apparent evidence at the "scene of the crime". Only with careful laboratory examination of electronic storage devices is it possible to recreate the evidence trail.

16.    *Need to review evidence over time and to maintain entirety of evidence.*   Your Affiant recognizes the prudence requisite in reviewing and preserving in its original form only such records applicable to the violations of law described in this Affidavit and in **Attachment B** in order to prevent unnecessary invasion of privacy and overbroad searches. Your Affiant advises it would be impractical and infeasible for the Government to review the mirrored images of digital devices that are copied as a result of a search warrant issued pursuant to this Application during a single analysis.  Your Affiant has learned through practical experience that various pieces of evidence retrieved from digital devices in investigations of this sort often have unknown probative value and linkage to other pieces of evidence in the investigation until they are considered within the fluid, active, and ongoing investigation of the whole as it develops.  In other words, the weight of each individual piece of the data fluctuates based upon additional investigative measures undertaken, other documents under review and incorporation of evidence into a consolidated whole.  Analysis is content-relational, and the importance of any associated data may grow whenever further analysis is performed. The full scope and meaning of the whole of the data is lost if each piece is observed individually, and not in sum. Due to the interrelation and correlation between pieces of an investigation as that investigation continues, looking at one piece of information may lose its full evidentiary value if it is related to another piece of information, yet its complement is not preserved along with the original.  In the past, your Affiant has reviewed activity and data on digital devices pursuant to search warrants in the course of ongoing criminal investigations.

17.    Your affiant has also learned from that experience, as well as other investigative efforts, that multiple reviews of the data at different times is necessary to understand the full value of the information contained therein, and to determine whether it is within the scope of the items sought in **Attachment B**.  In order to obtain the full picture and meaning of the data from the information sought in **Attachment A** and **Attachment B** of this application, the Government would need to maintain access to all of the resultant data, as the completeness and potential of probative value of the data must be assessed within the full scope of the investigation.  As such, your Affiant respectfully requests the ability to maintain the whole of the data obtained as a result of the search warrant, and to maintain and to review the data in the control and custody of the Government and law enforcement at times deemed necessary during the investigation, rather than minimize the content to certain communications deemed important at one time.  As with all evidence, the Government will maintain the evidence and mirror images of the evidence in its custody and control, without alteration, amendment, or access by persons unrelated to the investigation.

18.    *Nature of examination.*   Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, copying and reviewing the contents of the

11

Device consistent with the warrant.  The warrant I am applying for would authorize a later examination and perhaps repeated review of the Device or information from a copy of the Device consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the Device to human inspection in order to determine whether it is evidence described by the warrant.

19.     *Manner of execution.*  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## INVESTIGATION AND PROBABLE CAUSE

20.     The Device is currently in the lawful possession of the DEA, Denver Field Division Office.  It came into the DEA's possession in the following way: on September 26, 2019, LOPEZ and RAMOS-TELLEZ arranged and attempted to complete the purchase of approximately six (6) kilograms of cocaine from an undercover federal law enforcement officer (UC) at a secure law enforcement location.  Following LOPEZ and RAMOS-TELLEZ's arrival at the location and presentation of approximately $113,900 USD in cash by LOPEZ and RAMOS-TELLEZ to the UC to purchase the cocaine, the UC produced the cocaine for LOPEZ's and RAMOS-TELLEZ's inspection, and investigators contacted LOPEZ and RAMOS-TELLEZ shortly thereafter.  Investigators seized a number of items, including the $113,900 USD in cash, a money counter, and numerous cell phones, including the Device referenced herein.  The Device was located on Edgar RAMOS-TELLEZ's person after his arrest on September 26, 2019, in Denver, Colorado.

21.     The Device is currently in storage at the DEA Denver Field Division Office, under case number MK-16-0044, Exhibit N-343, SSEE S000897975, and has been in DEA's custody since September 26, 2019.  The Device is locked and investigators have been unable to obtain any further information to identify the device with more specificity than what is included herein.  In my training and experience, I know that the Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of the DEA.

## I.     Background of Investigation and Communications Regarding Five (5) Kilogram Cocaine Purchase

22.     On July 17, 2019, the United States of America, including the DEA, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), and other law enforcement, began conducting a criminal investigation of suspected cocaine trafficking and distribution activities of the Defendants, JOHNNY JOE LOPEZ, EDGAR MARCELLO RAMOS-TELLEZ, and other unknown co-conspirators, in the Denver, Colorado area.

23.     On July 17, 2019, a DEA Confidential Source (the "CS") contacted your Affiant in regards to a phone call he/she had received from "Luis" (last name unknown, "LNU") at telephone number 720-

841-9573. The CS stated that he/she received a phone call from Luis LNU, who was a previous ounce quantity cocaine customer of the CS. During the call, Luis LNU told the CS that Luis LNU had an associate, subsequently identified as EDGAR MARCELLO RAMOS-TELLEZ, who was in need of a new cocaine source of supply, and who was interested in purchasing five kilograms of cocaine from the CS. Luis LNU told the CS that his associate (RAMOS-TELLEZ) wanted to meet the CS to discuss the details of this transaction. Luis LNU also stated that the CS could come over to his (Luis LNU's) residence to facilitate the introduction of the CS and RAMOS-TELLEZ. The CS declined and instead agreed to meet Luis LNU and RAMOS-TELLEZ at a public place later that evening, however, this meeting did not come to fruition that evening.

24.     On July 18, 2019, at approximately 9:00 p.m., the CS, under the direction of your Affiant, met in-person with RAMOS-TELLEZ at a Hooters Restaurant located at 1111 W. 120th Avenue, Westminster, Colorado 80234. During the course of this meeting, RAMOS-TELLEZ told the CS that in the past, RAMOS-TELLEZ would receive approximately 25 kilograms of cocaine per month from a source of supply located in Cancun, Mexico. RAMOS-TELLEZ further stated that this supply route was recently closed, leading RAMOS-TELLEZ to look for another cocaine source of supply. RAMOS-TELLEZ explained to the CS that RAMOS-TELLEZ had previously paid $25,000 per kilogram of cocaine, and RAMOS-TELLEZ wanted to keep that price and that he deals in volume. RAMOS-TELLEZ explained to the CS that he had several kilogram cocaine customers in and around the Denver, Colorado area. RAMOS-TELLEZ stated these cocaine customers were in their 40's, and that the customers picked up (meaning purchased) one to two (1-2) kilograms of cocaine regularly, and dealt in all cash.

25.     RAMOS-TELLEZ further informed the CS that RAMOS-TELLEZ had $125,000 cash, and that RAMOS-TELLEZ was interested in purchasing five (5) kilograms of cocaine from the CS. RAMOS-TELLEZ explained to the CS that he was currently dealing with a different cocaine source of supply, but that he was displeased with that source of supply because the source of supply charged $26,000 per kilogram of cocaine source of supply, and stated that he was only going to buy two (2) kilograms from that different source of supply to get RAMOS-TELLEZ by in the meantime until RAMOS-TELLEZ could purchase cocaine from the CS.

26.     RAMOS-TELLEZ further stated that that he would conduct business with the CS as long as the CS could commit to RAMOS-TELLEZ that he/she (the CS) could make it happen. The CS advised RAMOS-TELLEZ that he/she (the CS) could supply RAMOS-TELLEZ with the five (5) kilograms of cocaine, as well as additional amounts in the future. RAMOS-TELLEZ subsequently told the CS to reach out to his/her (the CS's) source of supply to confirm that the CS could steadily receive cocaine shipments for redistribution to RAMOS-TELLEZ. RAMOS-TELLEZ then asked the CS to call him (RAMOS-TELLEZ) the following day to confirm that the CS could get the five (5) kilograms of cocaine for RAMOS-TELLEZ to purchase from the CS.

27.     On August 26, 2019, the CS spoke on the phone to RAMOS-TELLEZ and advised RAMOS-TELLEZ that the five (5) kilograms of cocaine would be arriving on Tuesday, August 27, 2019, and that the CS would be ready to conduct the deal the following day. RAMOS-TELLEZ stated that he

would be available to meet with the CS at any point on August 28, 2019. However, this meeting did not come to fruition on that date (August 28, 2019).

## II.     August 29, 2019 Meeting with RAMOS-TELLEZ and LOPEZ

28.     On August 29, 2019, at approximately 12:03 p.m., the CS placed a monitored and recorded three-way phone call to RAMOS-TELLEZ at phone number 720-841-9573, at the direction of Special Agents with the DEA and ATF participating in this investigation. The CS explained to RAMOS-TELLEZ that the reason the five (5) kilogram cocaine transaction scheduled to take place on August 28, 2019, did not come to fruition was because the cocaine couriers had off-loaded the entire load of cocaine, including the five (5) kilograms to be purchased by RAMOS-TELLEZ, to another buyer. The CS further assured that the agreed upon amount (five (5) kilograms of cocaine) would still be delivered to RAMOS-TELLEZ in the near future. RAMOS-TELLEZ acknowledged this and expressed displeasure. The CS then offered to meet again with RAMOS-TELLEZ to further discuss how they would proceed with the transaction, and also advised that the CS was going to provide RAMOS-TELLEZ with contact information for the CS's "cousin," so that RAMOS-TELLEZ could coordinate directly with the CS's "cousin" regarding the sale of five (5) kilograms of cocaine.  The CS's "cousin" is in fact an undercover ATF Special Agent (referred to hereafter as the "UC").  RAMOS-TELLEZ agreed to meet and also advised that his (RAMOS-TELLEZ's) financial backer may also be willing to meet. The CS and RAMOS-TELLEZ agreed to meet later on this same day (August 29, 2019), and the phone call was concluded shortly thereafter.

29.     Later that afternoon, the CS received a telephone call from RAMOS-TELLEZ on telephone number 720-841-9573, informing the CS that RAMOS-TELLEZ and his criminal associate, later identified as JOHNNY JOE LOPEZ, wanted to meet in person to discuss the five (5) kilogram cocaine shipment. RAMOS-TELLEZ further stated to the CS that LOPEZ had "been in the game for a long time" and that LOPEZ preferred to meet in person versus talking over the telephone. RAMOS-TELLEZ also told the CS that LOPEZ lived in the area of I-70 and Washington Street (Globeville neighborhood). The CS subsequently agreed to meet with RAMOS-TELLEZ and LOPEZ at the Guadalajara Sports Bar, located at 2835 W. 72nd Avenue, Westminster, Colorado 80030.

30.     Later that day, approximately 3:00 p.m., your Affiant, along with DEA Task Force Officer (TFO) Soustek, met with the CS for the purpose of searching the CS and his/her vehicle for contraband prior to the CS's meeting with RAMOS-TELLEZ and Lopez.  Your Affiant conducted this search, as witnessed by TFO Soustek, with negative results. The CS was then debriefed and provided with technical electronic devices, including an audio recording device, to maintain on the CS's person during the meeting with RAMOS-TELLEZ and LOPEZ. The CS was then instructed to drive to the location of the meeting, Guadalajara Sports Bar located at 2835 W. 72nd Avenue, Westminster, Colorado 80030.

31.     At approximately 3:35 p.m., the CS arrived at the Guadalajara Sports Bar. The CS then went inside the Guadalajara Sports Bar and waited for the arrival of RAMOS-TELLEZ and LOPEZ.

32.     At approximately 3:54 p.m., your Affiant observed the arrival of a 2012 White GMC Denali XL, Colorado Registration: 539-YZI.  A later check of Colorado DMV records revealed the

registered owner of this vehicle is listed as Johnny J. LOPEZ, DOB 4-28-1956, at the address of 4720 N. Lincoln Street, Denver, Colorado 80216 (the "Lincoln Premises"). A search through the Colorado DMV also revealed that LOPEZ's Driver's License is valid, and also lists the address of 4720 N. Lincoln Street, Denver, Colorado 80216.

33.    Your Affiant observed the vehicle park directly in front of the business and along the curb line of 72nd Avenue. Your Affiant then observed a shorter Hispanic male, later identified to be LOPEZ, exit the front driver's seat of the vehicle wearing a purple shirt and black shorts. Your Affiant then saw a second Hispanic male, identified to be RAMOS-TELLEZ, exit the passenger side front seat of the vehicle. Both RAMOS-TELLEZ and LOPEZ then entered the Guadalajara Sports Bar and met with the CS.

34.    At approximately 4:13 p.m., your Affiant observed LOPEZ exit the Guadalajara Sports Bar and enter the front driver's seat of the 2012 White GMC Denali XL. Approximately a minute later, your Affiant observed RAMOS-TELLEZ exit the Guadalajara Sports Bar and enter the passenger side front seat of the vehicle. The 2012 White GMC Denali XL then departed the area. Surveillance was then terminated on RAMOS-TELLEZ and LOPEZ.

35.    At approximately 4:45 p.m., the CS departed the Guadalajara Sports Bar and met with SA Donahue and TFO Soustek at a safe meeting location. SA Donahue searched the CS and his/her vehicle for contraband with negative results, as witnessed by TFO Soustek. SA Donahue then recovered the technical electronic devices from the CS, and the CS was subsequently debriefed.

36.    During this time, the CS was shown a photograph of LOPEZ obtained from the Colorado DMV's database, and was not provided with any background information or details about the photograph. The CS positively identified the individual in the photograph as the "Old man" that was at the meeting and would be providing the $125,000 to purchase the five (5) kilograms of cocaine from the CS.

37.    Although the CS was equipped with electronic recording equipment, due to the ambient noise within the restaurant, the audio recording of the meeting is difficult to hear. As such, the CS was debriefed and provided the following information as the details of the meeting:

   a.    The CS stated that RAMOS-TELLEZ introduced LOPEZ as his financial backer.

   b.    The CS stated that he/she again advised RAMOS-TELLEZ and LOPEZ the reason for why the August 28, 2019, five (5) kilogram cocaine transaction did not come to fruition, and also apologized for the miscommunication.

   c.    The CS stated that LOPEZ advised the CS that LOPEZ had the cash for the transaction ($125,000.00), ready and that it was packaged in denominations including $20.00, $50.00 and $100.00 bills.

   d.    The CS stated that LOPEZ also offered to bring his money counter to the meeting on the day the transaction was to occur.

15

e. The CS further stated to LOPEZ and RAMOS-TELLEZ that the UC has more direct contact with the cocaine sources of supply, because the UC had been working with the cocaine source of supply for a longer period of time than the CS. As such, the cocaine source of supply had more confidence with the UC.

f. The CS provided RAMOS-TELLEZ with the UC's contact information so that RAMOS-TELLEZ could began to negotiate directly with the UC to arrange for the five (5) kilogram cocaine transaction to take place.

g. RAMOS-TELLEZ and LOPEZ affirmatively acknowledged and agreed, and the meeting was concluded shortly thereafter.

**III.    Communications with UC Involving Five (5) Kilogram Cocaine Transaction**

38.     On August 30, 2019, your Affiant conducted surveillance at the SUBJECT PREMISES. Parked in the driveway of the SUBJECT PREMISES was the same 2012 White GMC Denali XL that your Affiant and TFO Soustek observed LOPEZ operating on August 29, 2019, and the vehicle LOPEZ and RAMOS-TELLEZ utilized to get to the meeting with the CS.

39.     Between the dates of September 2, 2019 and September 10, 2019, the UC maintained direct contact with RAMOS-TELLEZ via telephone, at the same telephone number referenced previously, for the purposes of arranging a face-to-face meeting, where the details of the five (5) kilogram cocaine transaction would be discussed.  Some of these communications are described below.

40.     Subsequently, on September 2, 2019, the UC returned RAMOS-TELLEZ's phone call, and RAMOS-TELLEZ answered.  The UC advised RAMOS-TELLEZ that he (the UC) was out of town, and asked RAMOS-TELLEZ if he (RAMOS-TELLEZ) would be willing to meet with the UC to discuss the details regarding the previously referenced $125,000, five (5) kilogram cocaine transaction, when the UC returned to the Denver, Colorado area the following week. RAMOS-TELLEZ agreed, and explained to the UC that the transaction needed to occur as soon as possible because the "viejon" (meaning "old man," who investigators believe to be LOPEZ based on the information set forth herein), who was the financial backer for the transaction, had been ready for a long while. . The UC affirmatively acknowledged and advised RAMOS-TELLEZ that the UC would understand if RAMOS-TELLEZ and his associate needed to purchase cocaine from another supplier in the meantime. RAMOS-TELLEZ affirmatively acknowledged, and the UC gave RAMOS-TELLEZ "his word" that the transaction would occur. The UC and RAMOS-TELLEZ agreed to meet on the upcoming week, and the phone call was then concluded.

41.     On September 6, 2019, the UC placed a recorded phone call to RAMOS-TELLEZ, at the same telephone number described herein, to advise RAMOS-TELLEZ that the UC would be able to meet on the upcoming Tuesday (9/10/2019). RAMOS-TELLEZ affirmatively acknowledged, and the phone call was then concluded. The UC and RAMOS-TELLEZ continued to engage in cell phone text message

and phone call communications for the purposes of arranging a time and location to meet on September 10, 2019.

42.     On September 10, 2019, at approximately 1:12 p.m., the UC arrived at the previously referenced Hooters, located at 1111 W. 120th Avenue, Westminster, CO, where he had agreed to meet with RAMOS-TELLEZ. The UC parked his undercover vehicle and entered the restaurant to await RAMOS-TELLEZ's arrival.

43.     At approximately 1:20 p.m., RAMOS-TELLEZ entered the restaurant and made contact with the UC, where RAMOS-TELLEZ introduced himself as "Edgar". The UC then reiterated to RAMOS-TELLEZ that the reason the five (5) kilogram cocaine transaction scheduled to occur on August 28, 2019, did not come to fruition was because the cocaine couriers had off loaded the entire load of cocaine, including the five (5) kilograms portion to be sold to RAMOS-TELLEZ, portion to another buyer in Albuquerque, NM. The UC further assured RAMOS-TELLEZ that he would be able to provide RAMOS-TELLEZ with the five (5) kilograms of cocaine, however it was going to take approximately two (2) weeks because Border Patrol check points had reopened, necessitating additional precautions to move cocaine across the border.

44.     RAMOS-TELLEZ affirmatively acknowledged, and stated that he and LOPEZ had the money ($125,000.00) ready to purchase five (5) kilograms of cocaine, and that there would be no problems with the money on the day of the transaction. RAMOS-TELLEZ then asked if the UC had the ability to provide (front) RAMOS-TELLEZ and LOPEZ with two (2) or three (3) more kilograms of cocaine when RAMOS-TELLEZ and LOPEZ purchase the five (5) kilograms.  Based on my training and experience, I know that "Fronting" refers to providing controlled substances in advance of payment, with the understanding that payment will be made at a later date.  RAMOS-TELLEZ further explained that because of the long wait, the five (5) kilograms would be almost immediately sold and that RAMOS-TELLEZ and LOPEZ needed to fulfill more orders. The UC advised that he would attempt to front RAMOS-TELLEZ and LOPEZ two (2) or three (3) more kilograms of cocaine as a courtesy for the long wait, to which RAMOS-TELLEZ expressed appreciation.

45.     RAMOS-TELLEZ then explained that he and LOPEZ had the capability to sell ten (10) kilograms of cocaine every fifteen (15) days, based on the demand from their customers.  This is equivalent to approximately five (5) kilograms of cocaine per week. RAMOS-TELLEZ added that this was the quantity in which he and LOPEZ used to acquire and distribute from their previous source of supply, described above, however due to problems with the source of supply's ability to supply them with cocaine, RAMOS-TELLEZ and LOPEZ had since ceased conducting business with that source of supply. The UC affirmatively acknowledged and advised RAMOS-TELLEZ that moving forward, the UC would be able to supply RAMOS-TELLEZ and LOPEZ with ten (10) kilograms of cocaine, every two (2) weeks.

46.     RAMOS-TELLEZ continued to explain that his and LOPEZ's clientele consisted of persons of status in the Denver, Colorado area, including doctors and other professionals. RAMOS-TELLEZ stated that he and LOPEZ conducted business with caution and in a professional manner. The UC then advised RAMOS-TELLEZ that the UC and the UC's associates also conducted their business in

the same manner and as such, transactions were conducted at a warehouse owned by the UC and the UC's associates. The UC explained that business could be conducted there privately and with no problems, as opposed to conducting transactions in parking lots and/or the streets. RAMOS-TELLEZ then expressed his satisfaction with the manner in which the UC advised that he conducted business. During this meeting, RAMOS-TELLEZ stated to the UC that they could complete the five (5) kilogram cocaine transaction at the "old man's" house, which investigators understood to mean the Lincoln Premises.

47.    RAMOS-TELLEZ then referred to LOPEZ as the "dueno del billete" (meaning "owner of the cash"), and stated that LOPEZ wanted to attend this meeting, however, RAMOS-TELLEZ was not able to get ahold of LOPEZ prior to the meeting. RAMOS-TELLEZ stated that he was going to report the details of the meeting back to LOPEZ, and asked the UC if he would be willing to meet LOPEZ prior to the date of the transaction, to which the UC agreed. RAMOS-TELLEZ then asked the UC for a specific date of when the transaction was to occur. The UC asked RAMOS-TELLEZ to produce the calendar on his cell phone, and advised that the cocaine would be arriving late on the night of Wednesday, September 25, 2019. The UC then advised that he and his associates did not like to conduct business during night hours, and as such, the deal could take place around midday on Thursday, September 26, 2019. RAMOS-TELLEZ agreed and stated that it was better to conduct business during daytime hours, as there was much more ambient movement, so as not to raise suspicion.

48.    RAMOS-TELLEZ then stated that he had two (2) phones, and that it was not good to carry his business phone all of the time. As such, RAMOS-TELLEZ provided the UC with his "personal" phone number of 720 592-6043, so that the UC could contact him at any time. RAMOS-TELLEZ then advised that he was satisfied that the UC was of his word and that he could tell the UC was experienced in these negotiations. RAMOS-TELLEZ further acknowledged that the transaction would occur on September 26, 2019, and stated that he would not contact the UC until the date of the transaction neared. The UC affirmatively acknowledged and advised RAMOS-TELLEZ that he would contact RAMOS-TELLEZ should anything change. RAMOS-TELLEZ affirmatively acknowledged, then excused himself from the meeting and exited the restaurant at approximately 1:38pm. The UC exited the restaurant shortly thereafter, returned to his undercover vehicle, and departed from the Hooters parking lot.

## IV.    September 26, 2019 Reverse Cocaine Transaction and Arrest

49.    On September 24, 2019, RAMOS-TELLEZ initiated contact with the UC via telephone and inquired about the five (5) kilogram cocaine transaction. The UC reassured RAMOS-TELLEZ that everything is still on time to be conducted on September 26, 2019. RAMOS-TELLEZ acknowledged that the transaction would take place on September 26, 2019.

50.    On September 25, 2019, at approximately 4:34 p.m., the UC spoke to RAMOS-TELLEZ via telephone. The UC notified RAMOS-TELLEZ that it (the cocaine shipment) was on its way and that it would arrive later that evening. The UC inquired about the money counter mentioned by LOPEZ during RAMOS-TELLEZ's and LOPEZ's previous meeting with the CS (described herein), and asked whether RAMOS-TELLEZ and LOPEZ could bring it to the deal. RAMOS-TELLEZ indicated that they (meaning RAMOS-TELLEZ and LOPEZ) don't have the money counter, and that they had to hand count all the

money the night before (9/24/19). RAMOS-TELLEZ then asked the UC to let him know when it (the cocaine shipment) gets in tonight (9/25/19) and when and where tomorrow (9/26/19) to conduct the transaction.

51.     On September 25, 2019, at approximately 8:00 p.m., the UC received a text message from RAMOS-TELLEZ advising that they have a money counter. The UC replied and told RAMOS-TELLEZ that the load was almost here and that the UC would let him know when it got here. On September 25, 2019, at approximately 9:27 p.m., the UC called RAMOS-TELLEZ and advised him that the load had arrived.

52.     On September 26, 2019, at approximately 12:19 p.m., the UC spoke with RAMOS-TELLEZ on a phone call regarding the five (5) kilogram cocaine transaction planned for that same day. During the call, RAMOS-TELLEZ once again offered to conduct the transaction at the Lincoln Premises, so that the UC could see how RAMOS-TELLEZ and LOPEZ do things.  RAMOS-TELLEZ further stated that if the UC did not want to meet at the Lincoln Premises, they (RAMOS-TELLEZ and LOPEZ) would come to the UC to meet.

53.     On September 26, 2019, at approximately 1:18pm, DEA investigators on surveillance at the location of the Lincoln Premises observed RAMOS-TELLEZ and LOPEZ exit the Lincoln Premises and enter a white Ford Explorer, Colorado license plate number XCO-264, the registered owner of which is listed RAMOS-TELLEZ.  Earlier that day, investigators observed RAMOS-TELLEZ and LOPEZ load items into this vehicle from the detached garage on the Lincoln Premises.

54.     Investigators followed the vehicle as RAMOS-TELLEZ and LOPEZ left the Lincoln Premises.  Although investigators on surveillance briefly lost sight of the vehicle, they were able to re-establish surveillance on the vehicle after a short period of time based on the vehicle's direction of travel.

55.     On September 26, 2019, DEA and ATF investigators staged the previously described warehouse, the location provided by the UC to RAMOS-TELLEZ and LOPEZ as the location for the cocaine transaction, in preparation for the cocaine transaction.  These efforts included setting up electronic devices for video and audio monitoring, and obtaining six (6) kilograms of cocaine from the custody and control of the DEA for use during the operation.  In previous communications with the UC occurring over the last seven (7) days, the UC and RAMOS-TELLEZ discussed the UC "fronting" RAMOS-TELLEZ and LOPEZ an additional kilogram of cocaine, to be paid for at a later date.   This warehouse is secure location in the Denver, Colorado area.  While the specific location of this warehouse is known to your Affiant, the precise location will not be disclosed herein.

56.     At or about approximately 1:45 p.m., RAMOS-TELLEZ and LOPEZ arrived at the warehouse location in the previously identified Ford Explorer.  Upon arrival, RAMOS-TELLEZ and LOPEZ exited the vehicle and made contact with the UC, as well as an additional undercover ATF Special Agent ("UC2").  LOPEZ immediately stated to the UC that he (LOPEZ) had a money counter, and retrieved the money counter from the back seat of the vehicle.  LOPEZ removed the money counter from the bag in which it was held, and the UC and LOPEZ plugged the device in.

57.     LOPEZ then asked RAMOS-TELLEZ to go get the money from the vehicle.  RAMOS-TELLEZ then walked to the vehicle and retrieved a black bag.  LOPEZ then told the UC and UC2 that they (LOPEZ and RAMOS-TELLEZ) had the money for four (4) kilograms, but only partial payment for the fifth kilogram, and indicated that he and RAMOS-TELLEZ were $15,000 short.  Investigators understood this to mean RAMOS-TELLEZ and LOPEZ had brought $110,000, instead of the agreed-upon $125,000.  Once RAMOS-TELLEZ returned from the vehicle with a black bag, he and LOPEZ opened the bag to reveal four packages of vacuum-sealed US currency, each of which had the words "25" inscribed on them, indicating they each contained $25,000, for a total of $100,000.  A fifth, opened package was also contained within the bag, believed to contain the additional $10,000.

58.     The UC then took the opened package from the black bag and began putting the US currency through the money counter.  The UC also signaled for UC2 to retrieve the previously-referenced six (6) kilograms of cocaine, and set a scale on the table next to the money counter.

59.     UC2 retrieved three (3) kilograms from a secure location within the warehouse, and brought them back to the UC, LOPEZ, and RAMOS-TELLEZ.  The UC2 then handed the three (3) kilograms of cocaine to RAMOS-TELLEZ.  RAMOS-TELLEZ then asked the UC "did you end up getting all six of them?" to which the UC responded "Yes."  RAMOS-TELLEZ then set the three (3) kilograms of cocaine on the table. UC2 then retrieved the additional three (3) kilograms of cocaine, and also set them on the table.

60.     RAMOS-TELLEZ then asked the UC how he would like RAMOS-TELLEZ and LOPEZ to pay the UC for the additional $15,000 owed for the fifth kilogram of cocaine, as well as payment for the additional "fronted" sixth kilogram.  The UC responded that RAMOS-TELLEZ and LOPEZ should bring all of the money at the same time once they had it.

61.     After each of the six (6) kilograms of cocaine were set on the table, LOPEZ asked the UC "can I cut a V?" Based on my training and experience, I know that "cutting a V" or "cutting a window" refers to cutting a triangle-shaped hole in a kilogram of cocaine to inspect the product.  The UC agreed, and LOPEZ cut into one of the kilograms.  As he did so, LOPEZ explained "I like to cut into them" so he could tell if the cocaine is synthetic or not.  After cutting the surface of the plastic packaging on the kilogram, LOPEZ moved his face near the package, as if to inspect the quality.  LOPEZ then set the kilogram down on the table, and performed the same to a second kilogram of cocaine.  LOPEZ then stated he did not need to cut into more of the kilograms, and asked the UC if they had duct tape, to be used to cover the cut holes in the two kilograms.  The UC further asked LOPEZ if he (LOPEZ) wanted to weigh the kilograms, and LOPEZ responded that he could tell by the packaging that they were good.  LOPEZ and RAMOS-TELLEZ then began loading the six (6) kilograms of cocaine into a black duffel bag provided by the UC.  After all six (6) kilograms were placed in the bag, LOPEZ zipped up the bag.  The UC then gave a prearranged arrest signal, and both LOPEZ and RAMOS-TELLEZ were taken into custody without incident.  Investigators recovered the black bag containing five (5) bundles of pre-packaged US Currency, four (4) of which have the words "25" inscribed on them.  These five (5) bundles contain approximately $113,900.

62. During a search of LOPEZ's and RAMOS-TELLEZ's person, as well as a search of RAMOS-TELLEZ's vehicle, the white Ford Explorer. Investigators found numerous cell phones, including the Device. The Device was located on Edgar RAMOS-TELLEZ's person after his arrest on September 26, 2019, in Denver, Colorado. The Device is locked and investigators have been unable to obtain any further information to identify the device with more specificity than what is included herein.

## CONCLUSION

63. Based on the foregoing information, probable cause exists to believe that a forensic examination of the Device, described in **Attachment A**, will reveal electronically stored data described in **Attachment B** constituting evidence, fruits, and instrumentalities of the Subject Offenses committed by LOPEZ, RAMOS-TELLEZ, and other co-conspirators. Specifically, your Affiant believes that LOPEZ, RAMOS-TELLEZ, and other co-conspirators may have used the Device to discuss, plan, and/or coordinate the planned drug transaction described herein, both on the date of the offense described above, as well as on other dates, and may have also used the Device to communicate with others regarding similar or related offenses. Contained on the Device may be records of said communications, as well as other information and evidence, set forth in **Attachment B**, that is related to this investigation.

64. Your Affiant therefore respectfully requests that the attached Search Warrant be issued authorizing the search and seizure of the items described in **Attachment A**, for the evidence listed in **Attachment B**.

I, Ryan P. Donahue, a DEA Special Agent, being duly sworn according to law, hereby state that the facts stated in the foregoing affidavit are true and correct to the best of my knowledge, information and belief.

*s/Ryan Donahue*
Ryan Donahue, Special Agent
Drug Enforcement Administration

SUBSCRIBED and SWORN by reliable electronic means this __26th__ day of October, 2020.

BY THE COURT:

HON. SCOTT T. VARHOLAK
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF COLORADO

**Reviewed and submitted by Conor A. Flanigan, Assistant United States Attorney.**

21